Richard P. NEEDHAM, Plaintiff,

v.

BEECHAM, INC., Defendant.

Civ. No. 76–173 P.

United States District Court,
D. Maine.

May 12, 1981.

Severin M. Beliveau, Augusta, Me., Walter G. Bilowz, Boston, Mass., Thomas M. Egan, Jonathan S. Piper, Portland, Me., for plaintiff.

Peter J. Rubin, Leonard M. Nelson, Portland, Me., Douglas F. Seaver, Gaston Snow & Ely Bartlett, Boston, Mass., for defendant.

## MEMORANDUM OF OPINION AND ORDER OF THE COURT

GIGNOUX, Chief Judge.

Plaintiff Richard P. Needham brings this action under the Age Discrimination in Employment Act of 1967, as amended, (ADEA), 29 U.S.C. §§ 621–34, against his former employer, Beecham, Inc. Plaintiff, who was 41 years old at the time, alleges that defendant terminated his employment because of his age in violation of Section 623(a)(1) of the Act. He seeks declaratory and injunctive relief, and damages. Juris-

diction is asserted under 28 U.S.C. §§ 1331, 1332, 2201. The complaint was filed in this Court on December 2, 1976.

The action has been tried to the Court, without jury, and the issues have been comprehensively briefed and argued by counsel. The following memorandum opinion contains the Court's findings of facts and conclusions of law as required by Fed.R.Civ.P. 52(a).

## I.

## THE FACTS

### A. *Background: Plaintiff's Employment*

Plaintiff began working as a salesman for S. E. Massengill Co., Inc., a manufacturer of pharmaceutical products, in October 1962. Plaintiff's sales territory initially encompassed only northern Maine, but by 1970 had expanded to include the entire state except York County.

Massengill merged with defendant in 1971. After the merger, plaintiff continued to work for defendant's Beecham-Massengill Pharmaceuticals Division. Defendant's pharmaceutical products were marketed through a national sales force that was divided into regional sales areas, then further subdivided into district sales areas. Plaintiff continued to work until his termination the same 15 counties in Maine that he had worked before the 1971 merger; this territory fell within the New England District of the Northeast Region.

Plaintiff's work chiefly entailed promoting the use of Beecham-Massengill products by doctors and hospitals in his territory, and selling those products to pharmacies and hospitals. Traveling throughout the state, plaintiff visited doctors, hospitals and pharmacies daily; showed them various portfolios of product lines; and attempted to sell the product. He called upon an average of five to seven physicians per day, and recorded his visits in detail on "daily call reports."

Because his work required travel throughout the state, plaintiff divided his territory into several areas (Portland, Lewiston, Bangor, and Aroostook County, for example), and worked in each area for about one week at a time. While working in those areas that were too far to permit commuting from his home in Stillwater, Maine, plaintiff maintained an expense account. Defendant reimbursed him for meals and motel expenses. In addition, defendant provided him with a company car; paid for the maintenance of the car; and reimbursed him for gasoline expenses.

After the 1971 merger, the general procedure for expense reimbursement was as follows. Actual payment to a salesman was effected by means of a weekly "travel letter," a negotiable instrument which the salesman made payable to himself. Thus, every week plaintiff could negotiate a travel letter and pay himself for the out-of-pocket expenses incurred that week. Defendant permitted reimbursement up to a specified amount. (In 1971 the weekly expense ceiling was $90; at the time of plaintiff's termination, he was allowed $110 per week.) Every two weeks plaintiff submitted to his District Manager an expense report with all receipts attached. After approval by the District Manager, the report and receipts were sent to the Regional Manager, who approved the submission and sent them to defendant's central office in Bristol, Tennessee for a final check.

### B. *Events Leading Up to Plaintiff's Termination*

In September 1973, an employee in defendant's central office brought to the attention of defendant's Chief Accountant, Harold Robinson, an audit of plaintiff's expense reports. Robinson reviewed those reports as well as plaintiff's file, and concluded that some of plaintiff's expenses appeared inconsistent and high. Robinson informed Alan Karp, the Northeast Regional Manager, of his findings. On September 20, 1973, Robinson sent to Karp a second memo, which reported that a review of plaintiff's car maintenance file revealed "strange circumstances:" plaintiff's average monthly car maintenance costs were high because he had purchased 16 new tires

in an 18-month period, from December 1971 to May 1973. Robinson noted the plaintiff had received a new car in October 1971. These reports caused Karp to review plaintiff's file and conclude further investigation was necessary.

After Karp had reviewed plaintiff's file, he contacted Matt Chrostowski, plaintiff's District Manager, and arranged for Chrostowski to make a field contact visit with plaintiff in October 1973. A field contact visit was a routine practice in which a district manager accompanied a salesman on his business rounds for several days. Chrostowski flew to Augusta on Monday, October 22, and accompanied plaintiff for the remainder of that day and the next. He flew out of Augusta on Wednesday, October 24. They stayed at the Roundhouse Motor Inn in Auburn on Monday and Tuesday nights and checked out Wednesday morning.

Following Chrostowski's field contact visit, expense reports submitted by plaintiff were reviewed. Two such reports pertaining to recent expense periods raised suspicion.

The expense report submitted by plaintiff for the period in which Chrostowski had made his field contact visit appeared to claim excessive reimbursement for motel expenses. Although Chrostowski reported that plaintiff had checked out of the Roundhouse Motor Inn with him on Wednesday, October 24, plaintiff's expense report recorded a stay of *four* nights (instead of two) at $14.44 per night, totaling $57.76. Attached to the expense report was a handwritten receipt for payment of $57.76. The receipt bore the signature of "Cecilia Talpey," who was later learned to be a desk clerk at the Roundhouse Motel.

Robinson asked William Hepburn, defendant's Division Comptroller, to audit plaintiff's expense report for the period October 22 to November 2, 1973. Hepburn called the Roundhouse Motor Inn and spoke with the proprietor, Richard Alphen. Hepburn was told that it was not the customary practice of the motel to issue handwritten receipts. In addition, he spoke with a wom-

an who identified herself as Ms. Talpey. After checking the motel records, she reported that plaintiff had stayed there three nights—October 22, 23 and 24, 1973, and had checked out on October 25, paying a total bill of $43.52. Hepburn informed Karp of his finding. Karp then telephoned Marion Jones, defendant's Vice President, and forwarded to him in Bristol, Tennessee, plaintiff's reports.

The second expense report which appeared to raise problems was the expense report for September 24 to October 5, 1973. Attached to this report was another handwritten motel receipt—this one from the Stagecoach Inn in South Portland. Karp called the motel to verify the expense report, and spoke with a person who identified herself as Mrs. Fiske, an employee of the motel. Karp was told that the motel records disclosed that plaintiff had stayed there on the nights of September 24, 25, 26 and 27, and was charged $15 per night. She also told him that it was not customary for the motel to issue handwritten receipts, but rather to use machine stamped receipts. The handwritten receipt attached to plaintiff's expense report indicated that he had paid $17 per night for each of the four nights. Karp notified Jones of his finding.

## C. *Plaintiff's Termination*

After these facts had come to light, a decision was made to terminate plaintiff. Karp testified that he did not "handle" plaintiff's termination, but that he did participate in the decision reached. Karp, Robinson, Hepburn, Chrostowski, and defendant's personnel director, Frank M. Barnett, all testified that they were not aware of plaintiff's age at that time, and that plaintiff's age did not influence the termination decision one way or the other.

On November 15, 1973, at Jones' request, Karp telephoned plaintiff, who was at a motel in Portland. Karp told plaintiff that his "expenses were exorbitant" and that he must come to Karp's office in New Jersey the following day, November 16, with all of the company's supplies and the company car for "final check out." Plaintiff asked,

"Does this mean termination?" Karp replied, "Yes."

Plaintiff did not go to New Jersey on November 16.[1] Karp called him again on Sunday, November 18, and told him to come to New Jersey the following day, Monday, November 19. Once again plaintiff did not go.[2] Although plaintiff testified that he continued to work sporadically in the three-week period following his November 15 telephone conversation with Karp, he did not submit any daily call reports or expense reports after November 15.[3]

On November 29, defendant's Director of Personnel, Frank M. Barnett, called plaintiff's home and spoke with plaintiff's wife, but plaintiff was not at home. When plaintiff returned Barnett's call, they arranged to meet at Logan Airport in Boston on December 5, 1973.

On December 5, plaintiff met with Barnett at Logan Airport. Barnett showed and explained to plaintiff a form entitled "Salesman Termination Check List." This form stated plaintiff's termination would show that it was due to "excessive costs of maintaining [his] territory," and specified the termination date to have been November 15, 1973. The company agreed in writing on the form to pay plaintiff his regular salary up through December 5, 1973, 12 days severance pay, and six days vacation pay. Final payments would be made at the end of December. Plaintiff and Barnett signed the form. Plaintiff did not question the termination date indicated on the form.

After completing the termination check list, Barnett accompanied plaintiff to his company car. Barnett took inventory of the controlled substances of which plaintiff had custody, and determined that a substantial portion of one substance was missing. He instructed plaintiff to return it to the regional office in New Jersey. Barnett then gave plaintiff a one-way ticket for a flight back to Bangor and took the company car.

### D. Events Following Plaintiff's Termination

About two months after his meeting with Barnett, plaintiff read in the February 3, 1974 Maine Sunday Telegram a Beecham-Massengill advertisement seeking a salesperson for the Maine territory. Since plaintiff was under the impression that defendant had intended to close out the Maine territory entirely upon his termination, he believed that defendant had treated him unfairly. After contacting United States Senator William Hathaway's office for assistance, sometime during the spring of 1974 plaintiff went to the Bangor office of the Department of Labor and met with William McCarthy, a Compliance Officer in the Wage and Hour Division. McCarthy questioned plaintiff about the details of his termination, including his age, but concluded that he could not determine whether plaintiff had a valid claim under any of several potentially applicable federal laws. Nothing plaintiff said to McCarthy suggested that age was a factor in his termination. Although McCarthy did not recall specifically whether he had informed plaintiff about ADEA, even though he recognized at the time that plaintiff fell in the protected age category, plaintiff in his deposition admitted that McCarthy had told him of that Act. McCarthy advised plaintiff to contact the Equal Employment Opportunity Commission (EEOC). Plaintiff obtained the necessary EEOC complaint forms through Senator Hathaway's office and filed those forms. Sometime during the summer of 1974, plaintiff consulted Severin M. Beliveau, Esq., one of his present attorneys.

---

1. Plaintiff testified a snowstorm prevented his driving to New Jersey on November 16. The United States Weather Bureau report for the Portland and Bangor areas shows, however, no snowstorm on that date.

2. Plaintiff testified he did not go to New Jersey on November 19 because of a flat tire. He did not, however, file any expense report for the tire change.

3. Although the last daily call report is dated November 16, 1973, plaintiff testified that he apparently misdated it. The report should have been dated November 15, 1973.

About two years later, in April 1976, plaintiff learned that a friend and former colleague at Beecham-Massengill, Alexander Stanowitz, 53 years old, had been terminated. Stanowitz showed plaintiff an article entitled "The Young Lions Join the Praetorian Guard" from a magazine, *Beecham Review,* which was published by Beecham Group Ltd.[4] Plaintiff testified that this article, which spoke of defendant's policy of *hiring* young aggressive salesmen, for the first time caused him and Stanowitz to suspect that they had been terminated because of age. Plaintiff and Stanowitz then consulted Walter G. Bilowz, Esq., also one of plaintiff's counsel in this action. On September 29, 1976, plaintiff filed with the Maine Human Rights Commission a complaint alleging age discrimination in employment by defendant. Because the complaint was not filed within six months after the alleged act of unlawful discrimination, the Maine Commission dismissed the complaint on October 14, 1976. On October 1, 1976, plaintiff filed with the Department of Labor in Boston a Charge and Notice of Intent, which alleged age discrimination in employment by defendant. Finally, on December 2, 1976, plaintiff commenced the present action in this Court.

## II

### THE LAW

For the reasons that follow, the Court concludes: (1) that plaintiff's action is time-barred both because the lawsuit was not filed in this Court within the applicable statute of limitations prescribed by Section 626(e)(1) of ADEA and because plaintiff has failed to comply with the procedural filing requirements of Section 626(d)(2) of the Act; and (2) that, in any event, plaintiff has not sustained his burden of establishing that his employment was terminated

because of his age as required by Section 623(a)(1) of the Act. Therefore, the action must be dismissed.

### A. *The Timeliness of Plaintiff's Action*

1. *Section 626(e)(1).* Section 626(e)(1) of ADEA adopts the statute of limitations set forth in the Fair Labor Standard Act (FLSA), 29 U.S.C. § 255. Section 255(a) of FLSA provides that an action "shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."

Plaintiff filed the present action in this Court on December 2, 1976. Therefore, any claim which arose prior to December 2, 1973, even a claim of willful discrimination, is time-barred.[5] The cause of action accrues on the date the alleged unlawful discriminatory act—in this case, the alleged discriminatory termination of plaintiff's employment—occurred. *See Delaware State College v. Ricks,* —— U.S. ——, 101 S.Ct. 498, 502–506, 66 L.Ed.2d 434 (1980).[6] The limitation period begins to run at the time when "the employee knows, or as a reasonable person should know, that the employer has made a final decision to terminate him, and the employee ceases to render further services to the employer." *Bonham v. Dresser Industries, Inc.,* 569 F.2d 187, 192 (3d Cir.), *cert. denied,* 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978); *Payne v. Crane Co.,* 560 F.2d 198, 199 (5th Cir. 1977) (per curiam); *Downie v. Electric Boat Division,* 504 F.Supp. 1082, 1084 (D.Conn.1980); *Gray v. Mortgage Bankers Association of America, Inc.,* 492 F.Supp. 914, 915–16 (D.C. C.1980); *Wagner v. Sperry Univac, Div. of Sperry Rand Corp.,* 458 F.Supp. 505, 510–13 (E.D.Pa.1978), *aff'd,* 624 F.2d 1092 (3rd Cir. 1980). *See Marshall v. Kimberly-Clark*

---

4. Defendant in this action, Beecham, Inc., a New Jersey corporation, is a wholly-owned subsidiary of Beecham Group Ltd., an English corporation.

5. The Court need not decide whether the two or three-year limitation period of Section 255(a) is applicable because of the Court's conclusion,

*post,* that this action was not filed within three years after the cause of action accrued.

6. Plaintiff does not allege any "continuing violation." *See Delaware State College v. Ricks, supra* at ——, 101 S.Ct. at 506.

*Corp.*, 625 F.2d 1300, 1301 (5th Cir. 1980). The alleged unlawful discriminatory act will be deemed to have occurred at that time, despite the continued payment to the employee of salary or benefits. *Bonham v. Dresser Industries, Inc., supra* at 191; *Payne v. Crane Co., supra; Gray v. Mortgage Bankers Association of America, Inc., supra. See Delaware State College v. Ricks, supra.*

■ In the present case, the parties agree that the alleged discriminatory act was plaintiff's termination, but plaintiff contends that plaintiff's termination occurred on December 5, 1973, the date of plaintiff's exit interview with Barnett at the Logan Airport in Boston. The evidence in the instant case clearly establishes, however, that, as defendant urges, plaintiff's termination took place on November 15, 1973. Plaintiff was informed that he was terminated on November 15, 1973, and he performed no work for defendant after November 15, 1973.

The record is clear that plaintiff knew of his termination on November 15, 1973. He concedes that on November 15 Karp telephoned him at his motel room in Portland; unequivocally told him that he was terminated; and instructed him to turn in his company equipment and supplies the following day. In addition, the termination checklist signed by plaintiff at his December 5 exit interview recited that his termination date was November 15, 1973; in a claim plaintiff filed with the Maine Department of Manpower Affairs Employment Security Commission on February 1, 1974, he stated that he was discharged by defendant on November 15, 1973; and a November 29, 1973 letter from Barnett to plaintiff referred to plaintiff's termination date as November 15, 1973. At no time prior to the filing of the present lawsuit did plaintiff question the November 15 termination date.

The record is equally clear that plaintiff performed no services for defendant after November 15, 1973. In his testimony at trial, he finally admitted that he had performed no work for defendant after Karp's telephone call and that he had submitted no daily call reports or expense vouchers after that date.

Since the termination date of plaintiff's employment was November 15, 1973, and plaintiff received unequivocal notice of his termination on that date, plaintiff failed to file the present action within the limitation period prescribed by Section 626(e)(1) of ADEA. The present action is therefore time-barred.

■ 2. *Section 626(d)(2).* Section 626(d) of ADEA provides that no civil action may be commenced by an individual under ADEA unless a charge alleging unlawful discrimination has been filed with the Secretary of Labor within 180 days after the alleged unlawful practice occurred, Section 626(d)(1), except that in a "deferral state" a charge must be filed within 300 days after the alleged unlawful practice occurred, or within 30 days after notice of termination of the state proceedings, whichever is earlier, Section 626(d)(2).[7] For purposes of this case, the parties agree that Maine is a deferral state. *See* 5 Me.Rev.Stat.Ann. §§ 4551–53, 4611–13 (1979); *Hadfield v. Mitre Corp.*, 562 F.2d 84, 87 (1st Cir. 1977).

. . . .

7. Section 626(d) reads:

(d) No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Secretary. Such a charge shall be filed—

(1) within 180 days after the alleged unlawful practice occurred; or

(2) in a case to which section 633(b) of this title applies, within 300 days after the alleged unlawful practice occurred, or within 30 days after receipt by the individual of notice of termination of proceedings under State law, whichever is earlier.

Section 633(b) provides:

In the case of an alleged unlawful practice occurring in a State which has a law prohibiting discrimination in employment because of age and establishing or authorizing a State authority to grant or seek relief from such discriminatory practice, no suit may be brought under section 626 of this title before the expiration of sixty days after proceedings have been commenced under the State law, unless such proceedings have been earlier terminated . . . .

In the present case, the alleged unlawful practice occurred on November 15, 1973. Plaintiff did not file his charge with the Secretary of Labor until October 1, 1976, nearly three years after the alleged discriminatory act. Since the filing of plaintiff's charge with the Secretary of Labor was clearly not within the maximum 300-day period prescribed by Section 626(d)(2), plaintiff has failed to comply with the procedural filing requirements of that section and the present action is time-barred. *See Mohasco Corp. v. Silver,* 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980).[8]

3. *Equitable Tolling.* Plaintiff contends that the ADEA limitations periods are subject to equitable tolling, and that equitable tolling is appropriate in this case. For present purposes, the Court will accept plaintiff's contention that the ADEA limitations periods are not jurisdictional and are, therefore, subject to equitable tolling.[9] Plaintiff has failed, however, to sustain his burden of justifying such a tolling in the instant case.

Plaintiff seeks to excuse his failure to comply with the ADEA filing requirements on two grounds. He maintains that defendant misinformed him regarding the reason for his termination and that he was misled by the Department of Labor Compliance Officer whom he consulted in early 1974. Neither allegation is supported by the record. Plaintiff was told unequivocally by Karp in his November 15, 1973 telephone call that the reason for his discharge was because his "expenses were exorbitant." In light of this, plaintiff's testimony that Barnett informed him at the December 5 exit interview that the territory was to be closed due to a "shortage of antibiotics" is hardly credible. Plaintiff's allegation is flatly denied by Barnett; none of plaintiff's termi-

nation documents make any mention that his territory was being closed for lack of antibiotics; and, in fact, plaintiff's own sales report for September 1973 discloses that the only products for which he was above goal at the time were the same antibiotics which he now claims were in short supply.

Similarly, plaintiff's allegation that he was misled by the Department of Labor Compliance Officer is not borne out by the evidence. Plaintiff admitted at his deposition that the officer informed him of ADEA, but stated that he did not believe plaintiff had a claim under that Act. The record shows that what the Compliance Officer told plaintiff was that *on the facts provided by plaintiff,* it did not appear he could prove a claim of discrimination. It is apparent that plaintiff then chose not to file a claim because he felt he did not have sufficient evidence to prove a case.

Moreover, the record shows that plaintiff consulted one of his present attorneys regarding his termination by defendant in the summer of 1974, well within the three-year and 300-day ADEA limitations periods following his termination. The courts have repeatedly held that equitable tolling is inappropriate when the plaintiff has consulted counsel during the statutory limitation period. *Keyse v. California Texas Oil Corp.,* 590 F.2d 45, 47 (2d Cir. 1978) (per curiam); *Smith v. American President Lines, Ltd.,* 571 F.2d 102, 109–10 (2d Cir. 1978); *Edwards v. Kaiser Aluminum & Chemical Sales, Inc.,* 515 F.2d 1195, 1200 n.8 (5th Cir. 1975). Once a claimant consults an attorney, he has "access to a means of acquiring knowledge of his rights and responsibilities," *Smith v. American President Lines, Ltd., supra* at 109; "the very purpose

---

**8.** Although *Mohasco* is a Title VII case, its teaching is directly applicable to cases arising under ADEA. *See Ciccone v. Textron, Inc.,* 651 F.2d 1 (1st Cir. 1981).

**9.** Every Circuit that has addressed the issue has adopted equitable tolling, both in the ADEA context and in the Title VII context. *See Coke v. General Adjustment Bureau, Inc.,* 640 F.2d 584 (5th Cir. 1981) (en banc), and cases there cited. The First Circuit has ex-

pressly reserved decision on the question, both with respect to ADEA, *Ciccone v. Textron, Inc.,* 616 F.2d 1216, 1218 n.3 (1st Cir. 1980), *vacated and remanded,* —— U.S. ——, 101 S.Ct. 311, 66 L.Ed.2d 143 (1980), *rev'd,* 651 F.2d 1 (1st Cir. 1981), and with respect to Title VII, *Daughtry v. King's Department Stores, Inc.,* 608 F.2d 906, 909 (1st Cir.1979).

of consulting an attorney is to ascertain what legal redress arises out of a factual situation encompassing a supposed wrong," *Edwards v. Kaiser Aluminum & Chemical Sales, Inc., supra.*

Plaintiff has failed to sustain his burden of showing that the limitations periods of ADEA should be equitably extended. The present action is therefore time-barred.

### B. *The Merits of Plaintiff's Action*

■ In order to prevail in an ADEA action, the plaintiff must prove that he was discharged "because of [his] age." 29 U.S.C. § 623(a)(1). *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1017 (1st Cir. 1979). In the present case, plaintiff has totally failed to show that his age was "a determinative factor" in his discharge, *see id.* at 1019–20, or, indeed, that his age was a factor that in any way affected defendant's decision to terminate his employment.

The "order and allocation of proof" to be used in ADEA cases has been set forth by the Court of Appeals for the First Circuit in *Loeb v. Textron, Inc., supra* at 1011–16, which adopted and applied the formulation presented by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a seminal decision involving a Title VII discrimination claim. A three-step analysis is required:

■ First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of age discrimination. Second, if the plaintiff establishes the prima facie case, the burden shifts to the defendant to produce evidence that the plaintiff was discharged for a legitimate, nondiscriminatory reason—that is, to "articulate" a legitimate, nondiscriminatory reason for the plaintiff's discharge. Third, if the defendant carries this burden, the presumption raised by the prima facie case is

rebutted, and the plaintiff then must prove by a preponderance of the evidence that defendant's proffered reason for plaintiff's discharge was not its true reason, but was a pretext for discrimination. *Loeb v. Textron, Inc., supra. See Texas Department of Community Affairs v. Burdine,* —— U.S. ——, —— – ——, 101 S.Ct. 1089, 1092–1095, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802–04, 93 S.Ct. at 1824–25.

■ 1. *Prima Facie Case.* Although the question is close, the Court is persuaded that plaintiff has carried his initial burden of establishing a prima facie case of age discrimination. The burden of establishing a prima facie case of discriminatory treatment is not heavy. *Texas Department of Community Affairs v. Burdine, supra,* —— U.S. at ——, 101 S.Ct. at 1095. To make that showing in an age discrimination case, plaintiff must demonstrate by a preponderance of the evidence four things: (1) that at the time of his termination, he was in the protected age group (40 to 65 years of age, 29 U.S.C. § 631 (1975)); (2) that he was performing his job at a level that met his employer's legitimate expectations; (3) that he nevertheless was fired; and (4) that his employer sought someone to perform the same work after he left. *Loeb v. Textron, Inc., supra* at 1014. *See Texas Department of Community Affairs v. Burdine, supra,* —— U.S. at ——, 101 S.Ct. 1095; *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802, 93 S.Ct. at 1824.[10] Defendant has stipulated that three of these four elements of a prima facie case have been satisfied: that plaintiff was within the protected age group; that plaintiff was discharged; and that defendant sought a replacement. Defendant argues, however, that an employee who falsifies his expense reports is not "performing his job at a level that [meets] his employer's legitimate expectations." The evidence clearly shows, however, that plain-

10. Alternatively, a prima facie showing of discrimination can be made by demonstrating that the employer engaged in a "pattern and practice of discrimination." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 334–43, 97 S.Ct. 1843, 1854–58, 52 L.Ed.2d

396 (1977); *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 804–05, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668. In the present case, plaintiff offered no evidence to support a finding of a pattern or practice of defendant to terminate older salesmen.

tiff's sales performance was adequate, if not exemplary in certain areas. The Court will, therefore, accept plaintiff's contention that he has satisfied this element of a prima facie case by showing that "he was 'qualified' in the sense that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative.". *Loeb v. Textron, Inc., supra* at 1014.

2. *Legitimate, Nondiscriminatory Reason.* Defendant has produced more ample evidence to overcome the presumption of discrimination generated by plaintiff's prima facie showing. The testimony of defendant's witnesses and the documentary evidence presented by defendant clearly show that the reason for plaintiff's discharge was the falsification of his expense reports, plainly, "a legitimate, nondiscriminatory reason" for plaintiff's termination. *Loeb v. Textron, Inc., supra* at 1011.

The uncontroverted testimony of Harold Robinson, defendant's chief accountant, was that in September 1973 a routine review of salesmen expenses revealed that plaintiff's expenses were high and erratic. Robinson then performed an analysis of plaintiff's general expenses covering the period March 1973 to August 1973, and later an analysis of his tire expenses. He testified that at the time of the audit he did not know plaintiff or his age. Robinson concluded that "I believe Mr. Needham is using these tires for possibly his personal car or selling the tires. I don't like to accuse anyone of wrongdoing, but we have had problems with Mr. Needham in the past for abusing his expense report." Robinson's analyses as well as plaintiff's expense files were sent to plaintiff's Regional Manager, Alan Karp. Robinson's report prompted Karp to send plaintiff's District Manager, Matt Chrostowski, to Maine on a field contact visit with plaintiff. Following this visit a dis-

crepancy was discovered between plaintiff's and Chrostowski's motel receipts for their stay at the Roundhouse Motor Inn in Auburn. Another discrepancy was found in a second expense report with respect to plaintiff's stay at the Stagecoach Inn in South Portland in September 1973. When inquiry was made of the two motels, motel personnel advised that their records did not show the information represented in plaintiff's expense reports. It was only after the receipt of the foregoing information that the termination decision was made.[11]

3. *Pretext.* A legitimate, nondiscriminatory reason for termination having been shown by defendant, plaintiff bears the burden of proving by a preponderance of the evidence that the proffered reason was not the true reason for the termination decision, but was a pretext for age discrimination. *Loeb v. Textron, Inc., supra* at 1014. In order to do so, plaintiff must show that a discriminatory reason "more likely motivated the employer," or that "the employer's proffered explanation is unworthy of credence." *Texas Department of Community Affairs v. Burdine, supra* —— U.S. at ——, 101 S.Ct. 1095; *see McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 804–05, 93 S.Ct. at 1825; *Loeb v. Textron, Inc., supra* at 1019–20.

In the instant case, plaintiff has utterly failed to prove that defendant's proffered reason for the termination of plaintiff's employment—falsification of his expense reports—was a pretext for age discrimination. Indeed, the uncontroverted evidence is that defendant's personnel involved in the decision to terminate plaintiff were not even aware of plaintiff's age at the time of his discharge.

The only evidence presented by plaintiff to show pretext was the expert testimony and statistical analyses of an industrial ger-

---

11. The critical issue here is the employer's motive. *Loeb v. Textron, Inc., supra* at 1012 n.6. In concluding that defendant has articulated a legitimate, nondiscriminatory reason for discharging plaintiff, the Court has relied solely upon evidence of the information available to defendant at the time the decision to terminate plaintiff was made. This evidence establishes clearly that defendant was motivated by the belief that plaintiff had falsified his expense reports. In this regard, the Court has not relied upon any of the evidence suggesting falsification of expense reports discovered in *post*-termination audits of company records. This latter evidence was admitted exclusively for the purpose of impeaching plaintiff's credibility, and the Court has considered it only for that purpose.

**470**

ontologist, Michael D. Batten, which, plaintiff argues, evidences a "youth hiring policy" that tainted the decision to discharge plaintiff. But Batten's evidence at best was inconclusive. His statistical analyses focused upon two trends: the average and median ages of defendant's Northeast Region sales force from 1971 to 1977; and the average and median ages of salesmen *hired* in the Northeast Region by defendant from 1971 to 1977. Briefly summarized, this evidence showed that the average age of defendant's Northeast Region sales force dropped during that period from 37 to 30 years of age, and the median age dropped from 36 to 27 years of age; and that the average age of salesmen *hired* by defendant during the same period fell from 33 to 28 years of age, and the median age fell from 35 to 26 years of age. In addition, the evidence showed that defendant *hired* only two salesmen over age 40 in 1971–72, and *hired* no one over age 40 from 1973 to 1977.

Taken in the light most favorable to plaintiff, at most, Batten's statistical analyses might suggest discriminatory *hiring* practices. *See generally Hodgson v. First Federal Savings and Loan Association*, 455 F.2d 818 (5th Cir. 1972).[12] The instant case, however, concerns a *termination* decision, not a *hiring* decision. Batten made no analysis of the termination rates of defendant's salesmen below and above the age of 40. Indeed, on cross-examination, he admitted that the retention rate of salesmen over the age of 40 was two and one-half times that of salesmen under the age of 40 during the period from 1973 to 1977: of the 21 salesmen over age 40 in 1973, 13 were still employed by defendant in 1977; of the 44 salesmen under age 40 in 1973, only 10 were still employed by defendant in 1977. These

figures illustrate the fundamental flaw in Batten's evidence—the failure to make any analysis of defendant's *termination* policies and practices. Batten's statistical analyses are wholly insufficient to support an inference that defendant's decision to terminate plaintiff resulted from a deliberate policy to discharge older employees and replace them with younger ones.[13]

### III

### ORDER

Judgment will be entered dismissing the action, with prejudice and with costs.

IT IS SO ORDERED.

12. Even for the purpose of showing discriminatory hiring practices, Batten's statistical evidence is inconclusive. No evidence was produced to indicate the number of persons over the age of 40 who applied for employment with defendant or the number of applicants over the age of 40 who were qualified for a salesman's position. It has been consistently held that hiring statistics considered in a vacuum, without evidence regarding the relevant labor market, will not support an inference of discrimination. *E. g., Grano v. Department of Develop-*

*ment of City of Columbus*, 637 F.2d 1073, 1078–79 (6th Cir. 1980).

13. At trial, the Court excluded, as inadmissible hearsay, the *Beecham Review* article, "The Young Lions Join the Praetorian Guard." Plaintiff, however, was in no way prejudiced by this ruling. Although the article discusses defendant's policy of *recruiting* young salesmen, it specifically emphasizes defendant's desire to *retain* experienced older salesmen in order to achieve a well-balanced sales force.