Victorina **PEREZ**, as personal
representative of the estate of
Nazario Perez, Plaintiff,

v.

**STATE OF MAINE and Department of
Manpower Affairs, Defendants.**

Civ. A. No. 79–159 P.

United States District Court,
D. Maine.

May 3, 1984.

Samuel Humpert, Mark Kierstead, Waterville, Maine, for plaintiff.

William H. Laubenstein, III, Susan P. Herman, Asst. Attys. Gen., Augusta, Maine, Martha E. Geores, Bell & Geores, Lewiston, Maine, for defendants.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

This is an action against the State of Maine [1] and the State Department of Manpower Affairs (DMA) for damages due to alleged discrimination in violation of 42 U.S.C. § 2000e *et seq.* (Title VII), 42 U.S.C. § 1981 *et seq.*, and the Fourteenth Amendment of the United States Constitution. This Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1343(4), 2201, 2202. The Complaint in this action was filed on July 30, 1979. Plaintiff in the original Complaint was Nazario Perez. On March 9, 1981, Plaintiff amended his Complaint to reflect, *inter alia*, that he was Hispanic. On April 1, 1982, Nazario Perez died. Thereafter Perez' personal representative and daughter, Victorina Perez, was substituted as Plaintiff in this action pursuant to Fed.R.Civ.P. 25(a)(1).

On November 22, 1982, Plaintiff filed a Motion to Amend her Complaint to

---

1. On July 2, 1980, the State of Maine was dismissed as a defendant due to its immunity from    suit under the eleventh amendment.

add members of the DMA as defendants, specifically: Charles Babbitt, Emelien Levesque, David Bustin, and William Malloy. Plaintiff also moved to add a count for wrongful death. On March 31, 1983, this Court issued its Memorandum Decision and Order deciding various motions of the parties. This Court granted Defendants' Motion to Dismiss the claim asserted by Plaintiff under 42 U.S.C. § 1981[2] and her claim for compensatory damages for pain and suffering, asserted under Title VII. The remaining motions for summary judgment were denied, as was Plaintiff's request to amend her Complaint to add a count for wrongful death. The Court granted Plaintiff's motion of November 22, 1982, for joinder of the additional defendants. Thus, the issues that remained for resolution at trial were Plaintiff's allegations under Title VII.

On October 4, 1983, default was entered against Defendant Charles Babbitt due to his failure to plead or otherwise respond to the Complaint. On October 31, 1983, Plaintiff filed a Motion for Default Judgment against Charles Babbitt pursuant to Rule 55(b)(2), Fed.R.Civ.P. On November 3, 1983, this Court granted motions to dismiss all counts as to Defendants Emelien Levesque, David Bustin, and William Malloy.[3] On December 13, 1983, Defendant Charles Babbitt filed a motion in this Court to set aside the default against him. Oral argument was heard on that day and the motion was granted, the Court having found that Babbitt had a substantial defense to Plaintiff's claim. Rule 55(c), Fed.R.Civ.P. Bab-

bitt thereupon moved orally to dismiss the Complaint against him and the Court granted the motion. Thus, the DMA was the only remaining defendant at trial.

### Facts

Trial was held in this matter on December 13–15, 1983. Both parties have filed post-trial memoranda. The evidence shows the following facts.

Nazario Perez, the original Plaintiff in this case, was a man of Hispanic origin. In April 1975 Perez began work as a Manpower Specialist I in the Maine Department of Manpower Affairs at the Waterville office. Perez was transferred to the Augusta office after approximately three months in Waterville. Perez' position was terminated in June 1976 due to a lack of funding from CETA, which was the source of funds for his position. In October 1976 Perez applied for a Manpower Specialist I position in South Paris, Maine. On November 10, 1976, Perez was interviewed by the manager of the South Paris office, Charles Babbitt. Babbitt notified Perez by letter dated November 15, 1976, that he had not been selected for the job.

Perez filed a complaint with the Affirmative Action Committee (AAC) of the DMA on November 16, 1976. The AAC's investigator, Carol Webb, determined that Perez had been discriminated against and that he should be offered a position as a Manpower Specialist I.

Perez filed a complaint against DMA and the State of Maine with the Maine Human

---

**2.** The Memorandum Opinion dated March 31, 1983, of this Court identifies Plaintiff's Count III as alleging a cause of action under 42 U.S.C. § 1983 against the DMA. Plaintiff's original Complaint and Amended Complaint refer only to 42 U.S.C. § 1981. Defendant's Memorandum in Support of Motion to Dismiss, filed September 6, 1983, refers only to § 1981 and not to § 1983, and Plaintiff's reply memorandum, filed September 15, 1983, refers only to § 1981. Both parties in their memoranda understood this Court's Memorandum Decision and Order filed March 31, 1983, to refer to the § 1981 claims and not to the § 1983 claims.

The Court finds that the eleventh amendment defense would be a bar to a suit against the

State of Maine under § 1981, *Edelman v. Jordan,* 415 U.S. 651, [94 S.Ct. 1347, 39 L.Ed.2d 662] (1974). In view of the parties' subsequent treatment of the issues in this case, the Court finds no reason to reconsider its dismissal of Plaintiff's claims against the individual defendants and the State of Maine or DMA under either § 1981 or § 1983.

**3.** It should be noted that in the Court's Order of November 3, 1983, the Court erroneously referred to an *Order of this Court dated August 4, 1983, Cyr, J. presiding.* In fact, the hearing from which the Order emanated was presided over by Judge Carter.

Rights Commission (MHRC) and the Equal Employment Opportunity Commission (EEOC) on April 22, 1977. The MHRC and the EEOC found that reasonable grounds existed to believe that Perez had been denied a position on the basis of his race. By October 17, 1978, the EEOC determined that conciliation efforts would continue to be unsuccessful and the case was referred to the Department of Justice for initiation of a civil action. On November 20, 1978, the MHRC filed suit in Maine Superior Court on behalf of Perez. The Complaint was filed by a Commission attorney who was a member of the State Attorney General's Office. The action appears to have been filed one day after the statute of limitations had run against the cause of action under the state law on November 19, 1978.

On May 1, 1979, Perez was notified by a "right-to-sue" letter from the Justice Department that the Department had decided not to pursue Perez' claim on his behalf but that he had a right to bring suit against the DMA under Title VII. Ten days later, Perez and the DMA signed a conciliation agreement that purported to settle the Perez claims then before the MHRC.[4]

4. The conciliation agreement, Defendants' Exhibit 25, provides as follows:

CONCILIATION AGREEMENT
Section I
GENERAL PROVISIONS

1. It is understood by the parties that this Agreement does not constitute an admission by the Respondent(s) of any violation of the Maine Human Rights Act, nor will any action taken by the Respondent(s) towards compliance with the terms and conditions of this Agreement be construed to constitute an admission by the Respondent(s) of any violation of the Maine Human Rights Act.

2. The Respondent(s) agree(s) that there shall be no retaliation of any kind against the Complainant because of opposition to any practice declared unlawful under the Maine Human Rights Act; or because the Complainant(s) having filed a complaint with the Commission; gave testimony or assistance to the Commission, or participated in any manner in any investigation, proceeding or hearing under Maine Human Rights Act.

3. The Complainant(s) deem(s) this Agreement to be fair and equitable and hereby waives, releases, and covenants not to sue the Respondent(s) with respect to any alleged violations of the Maine Human Rights Act specifically covered by the provisions of this agreement, subject to performance by the Respondent(s) of the promises and representations contained in this Agreement.

4. The Respondent(s) agree(s) that the Commission may review compliance with the terms of this Agreement.

5. This Agreement shall become effective when all parties hereto have signed the Agreement.

6. It is understood by all parties that this matter will be administratively dismissed pending ascertainment by the Commission that the terms of the agreement have been met.

SECTION II
*Complainant-Relief*

7. As evidence of its good faith in settling this matter, the Respondent agrees to pay the Complainant a sum of money in the amount of $20,000.00 as full and final settlement of this matter.

8. The Respondent's check, made payable to Nazario Perez, as payee, will be mailed directly to him at Route 6, Augusta, Maine 04330 within one month after receipt by the Respondent of the Commission's fully executed Conciliation Agreement. The check will be sent certified mail, with return receipt signed by Addressee only. A copy of both the check and the receipt shall be mailed to the Compliance Officer, Maine Human Rights Commission, State House, Augusta, Maine 04333, promptly after the signed receipt is returned to the Respondent.

9. The Respondent further agrees that the Complainant's employment record will not contain any adverse comments, documents or entries relating to the facts or circumstances which led to the filing of a complaint with the Maine Human Rights Commission and the related events occuring thereafter.

10. The Respondent will not engage in any retaliatory conduct against the Complainant because of these proceedings. The Respondent further agrees that no mention, oral or written, of the complaint and/or its resolution will be made by the Respondent in any communication it may have with other potential employers.

11. The Respondent agrees to assign its Affirmative Action Officer to monitor the Complainant's application for a position as a Manpower Specialist I to insure that national origin will not be a consideration in any action with regard to the Complainant's application.

12. The Respondent agrees to amend its existing Affirmative Action Plan to provide English language for employees who require assistance in order to satisfactorily perform their jobs. This training will be available upon request.

The agreement is executed by Perez and an official of the DMA. It is also signed to indicate

The agreement specified that Perez would receive $20,000 and in return would agree not to sue the DMA for its actions with respect to his claims under the Maine Human Rights Act. This Court finds that the DMA intended that the conciliation agreement terminate by voluntary settlement any cause of action held by Perez on May 10, 1979, arising out of the allegedly discriminatory actions of the DMA in October-November 1976. The Court is satisfied that Perez understood, at the time of the execution of the conciliation agreement, that he was abandoning his right to pursue his state court action. He did, in fact, do so and the action was dismissed by the Court, acting *sua sponte*, pursuant to Me. R.Civ.P. 41(b) for failure to prosecute the action. The Court also finds, however, that Perez consented to the settlement because he was concerned about the possibility that the pending state action would be found to be barred by the running of the state statute of limitations. At the time he participated in the settlement with DMA he intended to pursue the federal claims, arising out of the same DMA actions of October-November 1976, by an action commenced in federal court under Title VII as authorized by his "right-to-sue" letter issued to him by the EEOC on May 1, 1979. On July 27, 1979, Perez commenced the present action in this Court.

In January 1980 Perez applied for the position of Legal Researcher I in the Legal Division of the DMA. He was subsequently interviewed and notified by letter dated April 23, 1980, that he had not been selected for the position.[5]

## DISCUSSION

The DMA argues in its post trial brief that the conciliation agreement signed by all the parties bars a subsequent action in either state or federal court seeking adjudication of the same rights disposed of by the conciliation agreement. With regard to the settlement of claims brought in federal court under federal law the Fifth Circuit Court of Appeals has held that when an employee signs a conciliation agreement with the defendant in a Title VII action and the agreement dismisses a complaint, the employee may not subsequently sue the same defendant at a later date for the same cause of action arising out of the same operative facts. *United States v. Allegheny-Ludlum Industries Inc.*, 517 F.2d 826, 858–59 (5th Cir.1975). Congress has encouraged the parties to settle Title VII cases rather than to litigate them. *See* 42 U.S.C. § 2000e–5(b). If parties later dissatisfied with the settlement they have made of specific claims could later sue after both parties have signed a conciliation agreement, on the same claims as were disposed of by the agreement, there would be no reason for defendants to enter into such agreements. *Allegheny-Ludlum*, 517 F.2d at 859.

■ A plaintiff may waive his federal statutory rights under Title VII. *Alexander v. Gardner-Denver Company*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The DMA refers the Court to *Strozier v. General Motors Corp.*, 442 F.Supp. 475 (N.D.Ga.1977), for the proposition that a plaintiff who settles a grievance for relief that is "substantially equivalent" to the relief obtainable under Title VII will be deemed to have waived his right to sue under Title VII. The court in *Strozier* referred to *Gardner-Denver* for this proposition. The language used in *Gardner-Denver*, however, appears to be considerably narrower than as characterized by the court in *Strozier*. The Supreme Court said that a plaintiff may waive his rights under Title VII "if the relief obtained by the employee at arbitration were *fully equivalent* to that obtainable under Title VII ...." *Gardner-Denver*, 415 U.S. at 51, n. 14, 94 S.Ct. at 1021, n. 14 (emphasis added).

approval by officials of the MHRC and by the Compliance Officer of DMA.

5. Plaintiff does not assert Perez' rejection as an independent basis for her cause of action. This event occurred after the Complaint was filed.

As Plaintiff's Complaint was not amended to assert the event as basis for her cause of action, Plaintiff merely asserts that this is further evidence of the DMA's discriminatory actions.

In addition, such a waiver must be voluntary and knowing. *Id.* at 52, n. 15, 94 S.Ct. at 1021, n. 15.

The logic that a plaintiff may waive his right to assert a cause of action in federal court is consistent with the statutory scheme that Congress set forth in order to redress discriminatory employment practices. Specifically, Congress has provided that a charge of discrimination is to be investigated by the EEOC. If the EEOC determines that there is reasonable cause to believe that the charge is true the EEOC is to "endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." 42 U.S.C. § 2000e–5(b). Consequently, it follows that if a plaintiff could settle his claim and then proceed against the same defendant on the same cause of action arising out of the same operative facts, no defendant would sign a conciliation agreement. Thus the scheme for voluntary resolution of such claims envisioned by Congress in Title VII would be defeated.

Accordingly, the issues raised by the facts of this case are: (1) whether the cause of action asserted by Perez in this action is the same as that which was settled by the conciliation agreement, that is, is the latter "fully equivalent" to the former; (2) whether the relief available to be obtained there is the same as is obtainable under Title VII; and (3) whether the settlement in the state proceedings was entered into voluntarily and knowingly by Perez.

■ Perez' suit in state court was brought under Title 5 M.R.S.A. § 4572 (1979) which provides in pertinent part:

1. *Unlawful employment.* It shall be unlawful employment discrimination, in violation of this Act, except where based on a bona fide occupational qualification:

A. For an employer *to fail or refuse to hire or otherwise discriminate against* any applicant for employment *because of race or color*, sex, physical or mental handicap, religion, ancestry *or national origin* or age; or because of any such reason to discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment, or any other matter directly or indirectly related to employment, or in recruiting of individuals for employment or in hiring them, to utilize any employment agency which such employer knows or has reasonable cause to know, discriminates against individuals because of their race or color, sex, physical or mental handicap, religion, age, ancestry or national origin . . . .

5 M.R.S.A. § 4572(1)(A) (emphasis added). Plaintiff's claim in this Court is under Title VII and alleges the same factual basis for her cause of action as did Perez' suit in state court. The relevant section from Title VII provides.

(a) It shall be an unlawful employment practice for an employer—

(1) to *fail or refuse to hire* or to discharge any individual, *or otherwise to discriminate against* any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's *race, color*, religion, sex or *national origin;* or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2 (emphasis added). These two statutes are obviously virtually alike in substance as well as in language. In an examination of the legislative history leading to the enactment of 5 M.R.S.A. § 4572, the Maine Law Court has observed that "[d]uring the debates [legislative] it was noted that the Maine Act was patterned after the Federal Act," *Maine Human Rights Commission v. Local 1361, United Paperworkers International Un-*

*ion AFL–CIO, et al,* 383 A.2d 369, 374 (Me.1978), and it found that

> [o]ur examination of the legislative history and statutory structure of the Maine Act inescapably compels but one conclusion: the employment discrimination provisions in our statute were intended to be the State counterparts of the Federal Act complimenting [sic] and in certain circumstances supplementing the federal.

*Id.* at 375.

In *Maine Human Rights Commission v. City of Auburn,* 408 A.2d 1253 (Me.1979), the Law Court further examined the relationship between the Maine and Federal Acts. The court found that the federal body of case law that dealt with the methodology for evaluating evidence in Title VII actions was intended by the Maine Legislature to be expressly referred to by Maine courts in their construction of the Maine Human Rights statute. *Id.* at 1261. The court further concluded that the requirements which a plaintiff must satisfy in order to prove his case are the same under the Maine Act as under the Federal Act: (1) he must establish a *prima facie* case; [6] and (2) he must show that any legitimate, nondiscriminatory reason offered by defendant as justifying the employment action is merely a pretextual reason for an otherwise illegitimate action. *Cf. Needham v. Beecham, Inc.,* 515 F.Supp. 460, 468–70 (D.Me.1981).

■ Even where there is a conflict between the interpretation of the Maine and Federal Courts on issues such as what standard of proof to apply the Maine Law Court will defer to Federal Court interpretations in matters involving discriminatory employment practices.[7] In *Maine Human Rights Commission v. City of Auburn,* 425 A.2d 990 (Me.1981), the Maine Law Court wrote that "[s]ince we turn to federal antidiscrimination law for guidance in interpreting and applying the Maine Human Rights Act, we adopt, for the present limited purpose, the federal conception of 'clear and convincing' proof." *Id.* at 996, n. 3.

Finally, in *Percy v. Allen,* 449 A.2d 337, (Me.1982), the Maine Law Court wrote that where it is shown that a section of the Maine Human Rights Act essentially tracks Title VII, federal case law should be referred to in order to "illuminate the nature of our local statutes …." *Id.* at 342. Justice Wathen's concurring opinion underscores the fact that such deference is deliberately accorded by the Law Court to the content of the federal law in matters of employment discrimination. He wrote, by way of complaint, that "[d]iscrimination law in Maine to date has involved the adoption of rigid federal formulations and burden shifting devices …." *Id.* at 346–47.

In addition to the causes of action being identical under the Maine and federal statutes, the relief obtainable is fully equivalent to the relief obtainable under Title VII. Under Title VII

> [i]f the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or

---

**6.** The *prima facie* case standard as developed by the federal courts has been adopted by the Maine Law Court in its evaluation of disparate treatment cases under Maine law. *See Maine Human Rights Commission v. City of Auburn,* 408 A.2d 1253, 1262 (Me.1979).

**7.** Chief Justice McKusick, writing for the Maine Law Court, has stated that the Maine legislature, in enacting an antidiscrimination statute, "was legislating against the background of prior federal antidiscrimination statutes." *Maine Human Rights Commission v. City of Auburn,* 408 A.2d 1253, 1261 (Me.1979). Consequently, the familiarity of federal courts with discrimination cases under federal law has enabled federal courts to develop a methodology for evaluating such cases. *Id.* As a result "the Maine legislature—by adopting provisions that generally track the federal antidiscrimination statutes—intended the courts to look to the federal case law to 'provide significant guidance in the construction of our statute.'" *Id.* (citations omitted).

without back pay (payable by employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

42 U.S.C. § 2000e–5(g). Under Title 5 of the Maine statutes plaintiff may obtain, *inter alia:*

(1) An order to cease and desist from the unlawful practices specified in the order;

(2) An order to employ or reinstate a victim of unlawful employment discrimination, with or without back pay;

....

(7) An order to pay to the complainant civil penal damages not in excess of $100 in the case of the first order under this Act against the respondent, not in excess of $250 in the case of a 2nd such order against the respondent, and not in excess of $1,000 in the case of a 3rd or subsequent order against the respondent.

5 M.R.S.A. § 4613(2) (1983). Perez received $20,000 under the terms of the conciliation agreement as a compromise resolution of his substantive rights conferred by the Maine Act. The relief there available is fully equivalent to the relief obtainable by Perez under Title VII. The settlement proceeds were received by him as consideration for his release of substantive legal rights under the Maine Act that are fully equivalent to the substantive rights he now asserts under Title VII in this action.

The last issue that this Court must decide is whether Perez voluntarily and knowingly signed the conciliation agreement. The conciliation efforts in the state proceedings culminated in the signing by all parties in May 1979, of a conciliation agreement under which Perez received $20,000 as settlement of his state claim. Plaintiff maintains that Perez' signing of

the May 1979 conciliation agreement was not intended *by him* to be either a settlement or a waiver of his federal claims. James Mitchell, the attorney with whom Perez consulted beginning January 10, 1978, and a friend of Perez, testified at trial that Perez was well aware of his rights under both Maine and federal law and that Perez had done extensive legal research himself in these areas. Joanne Perez, Perez' wife in 1979, testified that Perez made two trips to Boston and several phone calls to Washington in order to confer with the EEOC. The content of the discussions which Perez had with the EEOC representatives in those calls and conferences is not shown by the record in this case.

It is not here contended and could not successfully be contended on the record here made, that Perez did not voluntarily enter into the conciliation agreement which ended the state proceedings. Clearly his conduct in entering into that agreement was knowingly and voluntarily done. Rather, the contention is, on close analysis, that the agreement should not be given effect to proscribe the assertion of his rights under Title VII. The reason given for this argument is that Perez did not subjectively intend that the agreement dispose of his Title VII rights. It is argued that he only agreed to the conciliation agreement because of his concern that the state action might be found to be barred by the statute of limitations. It is suggested that his exposure to that risk may have resulted from a conflict of interest on the part of the attorney in the Attorney General's office who was assigned to represent him in the state action as litigation counsel.

These contentions do not go, however, to the question of the voluntariness of Perez' conduct in entering into the conciliation agreement. They overlook entirely the fact that Perez was not restricted in reacting to those considerations to the option of either entering into the settlement or losing his state action if he did not do so. In addition to that option, he also had available to him the option, if he was fearful of

losing the state action, of voluntarily dismissing the action without prejudice, *see* Me.R.Civ.P. 41(a)(1), and repairing to the forum of the federal court to assert his rights under Title VII. Had he elected to follow that course, his rights under Title VII would have been fully preserved to him in litigation in the federal court. There would have been no question in such litigation of any preclusive effect arising from any conciliation agreement or any state court action whatever.

The record does not reflect a scintilla of evidence even tending to show that any person connected with the state action attempted to coerce him or to improperly influence him to enter into the conciliation agreement. There is no evidence that he was misled by any other person in arriving at that decision. To the extent that the decision was influenced by his erroneous view of the law as to the future proscriptive effect of the conciliation agreement, that erroneous view was derived by Perez independently of any influence by the other parties to the conciliation agreement or by his assigned litigation counsel. He did his own legal research on that issue, conferred with Mr. Mitchell as his independent legal advisor and counsel, and made his own decision to enter the conciliation agreement. He did not even indicate to his litigation counsel or to the other parties to the conciliation agreement that he believed he could continue to pursue remedies available under Title VII or that he intended to do so. They were, in fact, ignorant of any such belief or intention on his part. Clearly his decision *to enter into the conciliation agreement* was voluntarily arrived at and was executed without any coercive or otherwise improper influence from his litigation counsel or the other parties to the agreement.

Having voluntarily entered into the conciliation agreement, that agreement became complete upon its execution and the payment to Perez of the $20,000. It was a valid, executed contract of compromise settlement of claims based upon rights under state law that were "fully equivalent" to the rights he possessed at that time under Title VII. Perez' personal representative cannot now assert that a complementary cause of action available under another statute that is virtually identical to the one settled by the conciliation agreement remains viable. To do so would be contrary to the Congressional policy encouraging informal settlements. If that were to be the rule, then, as is noted in *United States v. Allegheny Ludlum Industries, Inc.,* 517 F.2d 826, 858–59 (5th Cir.1975), defendants would be reluctant, indeed wholly unwilling, to enter into a settlement of a claim under state law that is identical to that existing under Title VII if they could then be subjected to a lawsuit under Title VII and the resultant exposure to the risk of a second payment to settle the same claims.

Accordingly, the Court concludes that Perez intended to settle his claims based upon the bundle of rights and remedies available to him under the Maine Human Rights Act in order to obtain a payment of $20,000 and that he entered into the conciliation agreement voluntarily in order to accomplish that end. In so doing he effectively compromised his right to sue the Defendant in this court under Title VII. The claims effectively disposed of by compromise settlement under the conciliation agreement were based upon state-provided rights and remedies, under the Maine Human Rights Act, that are fully equivalent, if not identical in every material aspect, to those rights and remedies provided under Title VII, the benefits of which Perez' personal representative seeks in this action. Hence, the claims now asserted under Title VII were also validly disposed of by the compromise settlement contemplated by the conciliation agreement in the Maine proceedings.[8]

---

**8.** This result is analytically in accord with the theory of the recent United States Supreme Court case of *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, [102 S.Ct. 1883, 72 L.Ed.2d 262] (1982). There the Court held that a state-court judgment disposing of state-based claims that were *fully equivalent to rights capable of being asserted in federal court under Title VII*

Accordingly, it is hereby ORDERED that Plaintiff's Complaint be, and it is hereby, DISMISSED.

So ORDERED.

was operative under 28 U.S.C. § 1738 to proscribe a subsequent assertion of the Title VII rights on principles of full faith and credit and of *res judicata*. The predicate of that decision is the virtual equivalence of the state-provided rights and remedies to those provided by Title VII. The focus of the decision was on the question of whether the mechanism of state judicial decision of one package of those rights and remedies had a preclusive effect on the federal package of equivalent rights and remedies. Here we have the same predicate but a different mechanism of resolution of claims based upon those rights and remedies in the state proceedings, the preclusive effect of which mechanism is here in question. That is the mechanism of a valid compromise disposition in the state proceedings of the claims based upon the equivalent rights.

Entry of judgment, as in *Kremer*, is not the sole method by which claims asserted in litigation in respect to employment actions may be finally concluded, so as to preclude their subsequent assertion. A valid compromise settlement agreement intended to dispose of claims based on the asserted rights is as fully effective as is entry of judgment to fully and finally dispose of those rights. The only difference that may be noted is that the vitality of such a disposition is based upon principles of contract law rather than upon principles of Full Faith and Credit or of *res judicata*. The Congress has made clear its interest in encouraging resolution of such claims by compromise settlement, as has been noted in the text, and to that end it must be presumed that the Congress intends that the sanctity and finality of valid compromise settlements in respect to such claims be preserved.